IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2019

## JAMARIUS GANT v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
No. C-18-156      Kyle Atkins, Judge

_____

## No. W2019-00147-CCA-R3-PC

_____

The petitioner, Jamarius Gant, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial. After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. Ross Dyer, J., delivered the opinion of the court, in which Camille R. McMullen and Robert H. Montgomery, Jr., JJ., joined.

Alexander D. Camp, Jackson, Tennessee, for the appellant, Jamarius Deon Gant.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Alfred L. Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### *Facts and Procedural History*

On direct appeal, this Court summarized the facts surrounding the petitioner's convictions for aggravated robbery, aggravated kidnapping, and facilitation of burglary of a vehicle, as follows:

> This case arises from an incident at Jessica Spencer's apartment in Jackson, Tennessee, on the night of March 30, 2015. Ezikeal Scott testified that he and Ms. Spencer went to dinner that night and returned to her apartment. Mr. Scott stated that he sat on the couch in the living room and

that Ms. Spencer went to her bedroom. Mr. Scott said that a man, later identified as the [petitioner], came into the living room from the back of the apartment and sat down on the couch. Mr. Scott stated that the [petitioner] inquired about Mr. Scott's Ford Mustang, which was parked outside, and that Mr. Scott told the [petitioner] the Mustang was for sale. Mr. Scott said that the [petitioner] told him he had a gun for sale and showed Mr. Scott a revolver.

Mr. Scott testified that he heard a knock at the door, that Ms. Spencer told the [petitioner] to answer the door, and that a man, who was unknown to Mr. Scott, came into the apartment. Mr. Scott said that Ms. Spencer was in the bathroom when the man arrived. Mr. Scott stated that the man sat down on the couch beside him and that the [petitioner] stood behind the couch. Mr. Scott said that a second man, also unknown to Mr. Scott, entered the apartment. The man wore a ski mask that covered his face and held a handgun. Mr. Scott said that the masked man attempted to load the handgun with a bullet and that another bullet fell from the handgun's chamber onto the floor.

Mr. Scott testified that the [petitioner] ordered Mr. Scott to the back of the apartment and that the first unknown man escorted Mr. Scott. Mr. Scott stated that the [petitioner] came into the back room and told the first unknown man to "check him for anything that [he] had" and that the first unknown man began searching Mr. Scott's shirt and pants.

Mr. Scott testified that they escorted him to the living room and that the [petitioner] and the man wearing a mask ordered Mr. Scott to remove his clothing, his wallet and money, and to lie face-down on the floor. Mr. Scott stated that the masked man pointed a gun at him as he undressed and that he felt threatened. Mr. Scott said that he lay face down on the floor when the men brought Ms. Spencer into the living room. Mr. Scott stated that he and Ms. Spencer were ordered to sit on the couch.

Mr. Scott testified that the [petitioner] told the other two unknown men to go to Mr. Scott's Mustang and that the [petitioner] stayed with Mr. Scott and Ms. Spencer inside the apartment. Mr. Scott said that the unknown men returned with three televisions, cologne, and cell phones, which they had retrieved from Mr. Scott's Mustang. Mr. Scott stated that the [petitioner] and the men took his wallet, money, and another cell phone from Mr. Scott's pants pocket. Mr. Scott said that the masked man asked him if he wanted to see Ms. Spencer raped and that Mr. Scott replied, "No."

Mr. Scott stated that the unknown men left the apartment and that the [petitioner] told the men to "call . . . when you get to where you're going."

Mr. Scott testified that the [petitioner] remained in the living room with the revolver. Mr. Scott stated that the [petitioner] told him that he could not leave until the unknown men "got to where they were going." Mr. Scott said that the [petitioner] instructed him not to report the incident to the police. Mr. Scott stated that the [petitioner] allowed him to leave after approximately five minutes but that Ms. Spencer remained in the apartment. Mr. Scott stated that he drove his Mustang home. He said that his mother contacted the police, that he gave the police a statement, and that he gave the police a description of the [petitioner], who was wearing red clothing. Mr. Scott stated that he identified the [petitioner] in a photograph lineup.

On cross-examination, Mr. Scott testified that during the preliminary hearing, he mistakenly stated that no one other than the masked man was armed. He said the [petitioner] had a gun. On redirect examination, Mr. Scott stated that he "was being held like [he] couldn't move." He stated that before the [petitioner] allowed him to leave the apartment, the [petitioner] told him, "Don't call the police, I got your I.D."

Tamator Scott, Mr. Scott's mother, testified that her son was "scared" when he arrived home and that he was wearing only underwear. Ms. Scott stated that she saw her son's Mustang and that all of the televisions from the car had been removed. Ms. Scott said that she and her boyfriend drove to Ms. Spencer's apartment, that they "beat on the door," and that they called the police because they thought Ms. Spencer was being held hostage.

Jackson Police Officer Jonathan McCrury testified that he went to a possible hostage situation at Ms. Spencer's apartment. Officer McCrury said that when he arrived, he spoke with Ms. Scott and followed Ms. Scott to her home. Officer McCrury said that Mr. Scott was present at the home and was "visibly upset [and] afraid." Officer McCrury stated that he took Mr. Scott's statement and told officers to go to Ms. Spencer's apartment. Officer McCrury said that Mr. Scott told him about the items stolen from his Mustang.

Jackson Police Officer Christopher Austin testified that he went to Ms. Spencer's apartment, that he and other police officers spent

- 3 -

approximately ten to fifteen minutes trying to get into Ms. Spencer's apartment, and that he contacted the Jackson Housing Authority to gain access. Officer Austin said that the Jackson Housing Authority granted the officers access and that the officers performed a "protective sweep." Officer Austin said that the officers found a bullet and a wallet on the floor but that no one was in the apartment.

Jackson Police Sergeant Brian Spencer testified that a form with Ms. Spencer's photograph and personal information was prepared and that it was distributed door-to-door in a search for Ms. Spencer. Sergeant Spencer stated that he composed a photograph lineup and that Mr. Scott identified the [petitioner] in the lineup.

Jackson Police Investigator Daniel Long testified that he requested an "emergency ping" of Ms. Spencer's cell phone by the service provider. He stated that he received the ping information and narrowed Ms. Spencer's location to approximately ten units in Ms. Spencer's apartment complex. He said that police officers searched the area, knocked on doors, and entered apartments. Investigator Long stated that the [petitioner] and Ms. Spencer were found in one of the apartments and were detained.

Jatori Marie Bradford testified that she lived in the apartment in which the [petitioner] and Ms. Spencer were found. Ms. Bradford said that Ms. Spencer sent her a text message on the night of March 30, 2015, requesting Ms. Bradford open her door and allow them to enter her apartment. Ms. Bradford said that Ms. Spencer and the [petitioner] came into her apartment and that they stayed until the next day.

Ms. Bradford testified that she left her apartment the next morning, that she spoke with police officers, and that she did not tell the officers that Ms. Spencer was in her apartment. Ms. Bradford said that she left a second time and that when she returned, police officers were in her apartment. Ms. Bradford identified the [petitioner] from a photograph lineup as the person who stayed in her apartment with Ms. Spencer.

Jessica Spencer testified that she had known the [petitioner] for a few months at the time of the incident and that he lived in her apartment. She said that when she and Mr. Scott went inside her apartment, she went to the bathroom to take a shower. Ms. Spencer said that she heard "bumping and thumping" outside the bathroom. Ms. Spencer stated that

when she opened the bathroom door, the masked man held a handgun to her face.

Ms. Spencer testified that the masked man escorted her into the living room and that Mr. Scott lay face-down on the floor wearing boxers, an undershirt, and socks. Ms. Spencer stated that it appeared "they had already robbed [Mr. Scott]." Ms. Spencer said that the other two men left the apartment and that the [petitioner] told Mr. Scott that he could not leave until the [petitioner] received a telephone call. Ms. Spencer stated that she saw two firearms belonging to the [petitioner] and that one was a revolver.

Ms. Spencer testified that after Mr. Scott left her apartment, she went to Ms. Bradford's apartment. Ms. Spencer said that the [petitioner] followed her into Ms. Bradford's apartment and that they stayed until the next day when the police took her and the [petitioner] into custody. Ms. Spencer said that she did not know the robbery was going to take place and denied receiving any items from the robbery.

On cross-examination, Ms. Spencer testified that she had not been charged in relation to the incident. Ms. Spencer admitted that in a previous statement, she did not tell police officers that the [petitioner] held Mr. Scott hostage in the living room. Ms. Spencer said that the [petitioner] never kidnapped her or threatened to harm her. Ms. Spencer said that she was afraid of the [petitioner] after the robbery and that he had her cell phone and would not allow her to call anyone.

Jackson Police Officer Joseph Cepparulo testified that when he searched Ms. Bradford's apartment, he found the [petitioner] lying in a bathtub. Officer Cepparulo said that he found a plastic bag hidden in the toilet tank and that the bag contained a semiautomatic handgun and a revolver.

*State v. Jamarius Deon Gant*, No. W2016-02482-CCA-R3-CD, 2017 WL 4457593, at *1-3 (Tenn. Crim. App. Oct. 5, 2017), *perm. app. denied* (Tenn. Jan. 22, 2018).

Following the denial of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief in which he argued trial counsel was ineffective for (1) failing to object to the trial court's improper jury instruction regarding the kidnapping charge; (2) failing to file a motion to suppress; and (3) failing to object to erroneous jury instructions regarding the applicable range of punishment. Following the appointment of counsel, the petitioner chose not to file an amended petition. However, at the post-

- 5 -

conviction hearing, post-conviction counsel clarified the petitioner's first issue, arguing trial counsel was ineffective for failing to adequately present the defense that the kidnapping in this case was incidental to the robbery. Because the petitioner confines himself to this issue on appeal, we will summarize the evidentiary hearing testimony relevant to this claim.

The petitioner testified he told trial counsel he was willing to accept a plea offer "because [he] knew [he] was guilty." However, he believed the victim's confinement was incidental to the robbery and wanted to proceed to trial on the aggravated kidnapping charge. The petitioner testified the victim's confinement was merely for "security purpose[s]," and the evidence showed the victim was in the apartment prior to the robbery, the petitioner did not tie the victim up, and the petitioner let the victim leave after the robbery was completed. Although the petitioner explained his concerns with trial counsel, trial counsel did not present this defense to the jury. When asked what trial counsel should have done differently, the petitioner testified she should have asked the victim and Ms. Spencer whether "they fe[lt] like they [were] being kidnapped."

On cross-examination, the petitioner disputed much of the evidence presented at his trial. He denied having two accomplices, telling the victim to take his clothes off, or holding the victim at gunpoint until the petitioner's accomplices could get to safety. However, he acknowledged that the jury heard this evidence and that no witnesses testified to the contrary. The petitioner also acknowledged that this issue was included in his direct appeal and that this Court found the confinement was not incidental to the robbery and the evidence was sufficient to support the petitioner's conviction for aggravated kidnapping.

Appellate counsel testified he was appointed to the petitioner's case after trial counsel left the Public Defender's Office. On direct appeal, he raised the sufficiency of the evidence to support the petitioner's kidnapping conviction and argued the kidnapping was incidental to the robbery. However, this Court ruled the kidnapping and robbery were distinct events. On cross-examination, appellate counsel agreed he was not privy to any conversations between the petitioner and trial counsel.

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

### *Analysis*

The petitioner's sole issue on appeal is trial counsel's failure to adequately present a defense. Specifically, he argues trial counsel should have argued the kidnapping was incidental to the robbery. The State contends the petitioner has not established any

deficiency or prejudice from trial counsel's decision to pursue a different defense strategy. We agree.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688;

*Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Initially, we note trial counsel did not testify at the post-conviction hearing. "We have observed on many occasions that original counsel, when available, should always testify in a post-conviction proceeding when there is an allegation that he was ineffective." *State v. Hopson*, 589 S.W.2d 952, 954 (Tenn. Crim. App. 1979). Specifically, "the state should present the attacked counsel to show what occurred." *State v. Craven*, 656 S.W.2d 872, 873 (Tenn. Crim. App. 1982); *Garrett v. State*, 530 S.W.2d 98, 99 (Tenn. Crim. App. 1975).

Nevertheless, even without trial counsel's testimony, the petitioner failed to establish either deficient performance or prejudice. At the conclusion of the post-conviction hearing, the post-conviction court found:

> There's been no proof presented of any witness who could have testified to anything different than what was testified to at trial.

> There's been no testimony from any witness or any testimony from [the petitioner] here today to show what [trial] counsel should have done differently, what witnesses were out there to establish that the kidnapping was any greater – or was not any greater than what was needed to effectuate the robbery.

Upon our review of the record, we agree with the post-conviction court. The petitioner's claim that a more vigorous pursuit of his proposed defense would have yielded a more favorable verdict is purely speculative, especially in light of the evidence that the petitioner held the victim at gunpoint for five minutes after the completion of the robbery to allow his accomplices time to escape. Additionally, on direct appeal, this Court reviewed the relationship between the robbery and the kidnapping and concluded that the confinement "was not essentially incidental to the robbery and burglary and was significant enough to support an independent conviction for aggravated kidnapping." *Grant*, 2017 WL 4457593, at *6; *see State v. White*, 362 S.W.3d 559 (Tenn. 2012).

Accordingly, even if trial counsel were deficient in failing to argue the kidnapping was incidental to the robbery, the petitioner cannot establish prejudice, and, therefore, he is not entitled to relief.

## *Conclusion*

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

_____

J. ROSS DYER, JUDGE